Association of American Physicians and Surgeons Educational Foundation, AAPS, Pierre Corey, MD, Paul E. Merrick, MD, FCC, oh that's the board, and versus American Board of Internal Medicine, ABIM, American Board of Obstetrics and Gynecology, ABOG, American Board of Family Medicine, ABSM, Mark Wayne Mullen, Secretary. We'll hear first from Mr. Schlafly. Thank you, Chief Judge Hillroth, and may it please the court. I'm Andrew Schlafly. I represent Plaintiff's Appellants. The board defendants, ABIM and ABOG, have embarked on a campaign of retaliation against physicians based on their viewpoints, based on what they've said on important issues of public policy, abortion, COVID, things like that. Not how they practice medicine, but what they say in legislative hearings, and so on. So this is viewpoint retaliation by these four defendants, ABIM and ABOG. Now, they are private entities, but they have monopolies over board certification, and in medicine, you need board certification in order to practice in a hospital. So in the case of ABOG, that's the American Board of Obstetrics and Gynecology, they govern the doctors who deliver babies. So if a doctor is going to deliver a baby, the doctor needs to have board certification by ABOG. Have we gotten into the level of detail that we would be defining the relevant markets more precisely? Like, for example, I think your friend on the other side says that, oh, well, it's not every single hospital that requires board certification to deliver babies, and you can do it at certain smaller hospitals and that sort of thing. But there might actually be a market for the most sophisticated hospitals in the big major cities with the cutting-edge practice, and that might be a sub-market that would be relevant for determining whether or not they are monopolizing. Has that been an issue yet or discussed in this case? It hasn't, Chief Judge Elrod, because we're still at the pleading stage of this case. So this appeal is for motion to dismiss. Right. So the factual record here on appeal is my plea, is my complaint. And in my complaint, I say very clearly in several places that a physician needs board certification in order to practice in a hospital. And so when these board defendants take away that board certification, or threaten to take away that board certification, that has the effect of ending the medical career of these physicians. And also, do you plead that it also affects a chilling on all other physicians who might be so inclined, that you don't need to actually take away privileges for more than just two or three, a handful, but the message will be and you don't actually have to go through. You send out a big memo in 2022, and following up on your 2021 memo or whatever, and then you single out a few people. And then, did you plead that? I do, Your Honor. I plead that chilling effect. And the case law is very clear, as Chief Judge indicates, that merely threatening to do this is going to chill people, and that's a First Amendment violation, if there's state action. So I want to get into this issue of state action now. Deciding who can practice medicine is traditionally a public function. That's what state medical boards do, decide which physicians are competent to practice medicine. What these board defendants are doing, they've way outside their lane of testing for competency. That's what they did for decades. These board defendants were testing companies. They provide multiple choice exams to medical school residents, early in their training, to test their competence and their knowledge. They fill in a little, and do zeros, and take A for this, B for that, and stuff, and then it's objectively graded, and then there's a score, and then it's like, you pass, and you're competent. The physician's competent, they get board certified. That's what these board defendants did for nearly 100 years. And it's on that basis that hospitals require board certification, because they want a certain level of knowledge and competency. Now, in the past couple years, they've gone way outside their lane, and now they're dictating who can practice medicine. Now, that's a job for the state medical boards. Who can practice medicine? Who can deliver baby? That's for state medical boards. Just to be clear, you're saying that certification is not a state function, but decertification is? I am, Your Honor. I am. On page 14 of your reply brief, you include a question, well, you that ABOG includes a question in the certification exam about induced abortion procedures, and that those who oppose it have to give, and essentially, the right answer or lose points. So, if certification is not a state function, couldn't a board decline to certify based on viewpoint, and that's not a function under your position? Under my position, that's right. I'm not asserting that the initial certification based on knowledge and objectively grading exam is a state function. I'm not asserting that. That's happened for nearly 100 years by many of these certifying entities, and I'm not asserting that that's a state function, because it's primarily based on And in this example, and I give this example to show where ABOG is coming from, what their view on abortion is, that's why I give that example, but I'm not saying that that should be swept into the well of state action. Even if they decline to certify because they don't like the answer? That's my argument in this case. I'm not right. Is that just to avoid our precedent, or do you actually think that's correct? I'm not sure. Presume we had no precedent that governed us. Would you say that both should be covered, but at minimum, we shouldn't extend precedent that you might disagree with? I don't understand where you're coming from. Yes, Judge Hull. I'm not trying to go that far. I think in extreme examples, it could be a problem, and there may be objections based on that, but they're not doing that in an extreme way, and so I'm not extending that far with this appeal with this case. I'm not asking for a ruling that all board certifications are state action, because then you would have people suing when they're not initially certified, and you would have cases like that, and discrimination and so on, and I'm not going there, but this new campaign of de-certifying, of revoking board certifications, someone who's been a physician for decades, these are eminent physicians in my case. I'm just trying to understand. Is this about the viewpoint, or is it about the certification slash de-certification process? Well, if you're honest, it's a good question. It's about revoking certification based on viewpoint. And that's different from refusing to give certification based on viewpoint? I think it really is, because they're not doing that. They're not refusing to give certification based on viewpoint. These are multiple choice exams. Is your point that they're qualified? They were just excluded based on viewpoint? Is that what you're saying? Maybe that's where you're coming from. The initial qualification is primarily based on knowledge and competency. So you're saying that there is actually just not a violation on the initial qualification, but the thing you're suing on is the de-certification, which is where you have the facts that show that it's based on viewpoint only. That's the only reason why this makes any sense. It's not that your doctors committed malpractice in some kind of surgery or something. It's only because they spoke out or intended to speak out, and that is very clear. And so you just haven't sued on the other. That's right. What this case is, a physician who's been practicing for 30, 40 years, Paul Maris, he's one of the most widely published physicians in the world, and they're taking away his certification entirely based on what he said. Now, could the states... The states could choose to not have this be the sort of... Accept this. They could do their own... Like in Texas, for example, recently, the bar has chosen to not sort of use the ABA as the standard as doing its own accreditation to Texas Supreme Court, but the state has chosen to affiliate even for certification and de-certification. Is that correct? They have, but the primary problem is the hospitals and insurance networks required. And this has developed over decades, and a physician needs board certification to practice in a hospital. And everyone who delivers babies... And you need to be in a network or people are not going to want to come see you unless they're concierge patients or something. And even then, they might not come see you if you're not in the network for overexpensive care that you might need. That's exactly right. Are there any circumstances under which boards can de-certify that would not be state action? For example, if a doctor committed an assault or performed a surgery while under the influence of some sort of substance. Two answers to that excellent question, Judge Ramirez. One is if it's based on conduct, I don't think it needs to be considered state action, but even if it is considered to be state action, it's based on conduct. It's not a First Amendment violation. What if the doctor says, I don't think there's anything wrong with performing surgeries after I've smoked marijuana? It doesn't affect my ability to do it. That's a position and conduct. Well, then I think it would not be such an egregious First Amendment violation to de-certify that person. I think the boards would then have a strong case for de-certifying based on that linkage with conduct. And even if it is state action, I mean, there are instances where, and I found it on a congressional website recently, where there are many times the Supreme Court has said that there can be an infringement of First Amendment if there's a compelling interest. So even a state action, if they have a compelling interest to do it, they really need to protect public safety against some crazy doctor who's saying crazy things. And if they really need to do this, they can still do it. They just have to comply with strict scrutiny, given due process, narrowly tailor it to their roles. And so my question here on appeal, my very first question in my brief here, is whether publicly restricting physicians' ability to practice medicine is traditionally a public function. And it is. We don't need to get to the state action situation if we're just talking about the antitrust claims, right? You don't need state action for a Section 1 or Section 2 claim, right? That's right, Chief Judge. And do you allege in your pleading that this actually hurts consumers because consumers don't have the right to pick doctors if they don't want, it limits consumer opportunity. If you don't want to go to a doctor who thinks you're going to the gynecologist and you would prefer to not go to a gynecologist who thinks that men can have babies, and that's, I'm not saying, I'm just saying that's a hypothetical that someone might be of that viewpoint, because they want someone who is, that they believe is more scientific than that from their point of view. Would that be a problem for consumers? It would, Your Honor, and I do allege that it's an interference with patients' access to these physicians, these eminent physicians who are two of my plaintiffs here, Corey and Merrick, so now patients cannot get access to these physicians. The best physicians don't want to say what their thoughts are on these topics because they might lose these really important privileges. Right. Well, they actually, and they actually lost their privileges. Right, you're, yes, but I mean the chilling of that through the market. Do you allege any type of group boycott claim that they're using the trade association to conduct a group boycott, you know, in the idea, and do you urge that? I don't think I use the words group boycott. I do allege a Sherman section one and section two claims separately, and... A concerted refusal to deal. Do you say a concerted refusal to deal ever? I don't know that I use those words. I do allege that they're abusing their monopoly and they're interfering with the access to these physicians. I do allege that they're colluding to restrain trade. It's, it doesn't squarely fit into a lot of the because what they're doing is unprecedented. Well, we have had, I mean, I think just recently there was a case, of course, I mean, we have the Indiana dentist case, and we have, you know, have the engineers case, but we have recently even a case, the Global Alliance for Responsible Media alleged that they refused to place ads on specific platforms because of political reasons, not for money-making reasons, but just for politics to try to boycott certain platforms. That case, I believe, has been dismissed, but the organization had folded. So we have seen that, but we haven't seen that case placed out. So if you're not the only case that says politics is playing a role in these things that traditionally would just be about business, but do you have any comments, or are you aware of any other case? Do you have any comments on the Global Alliance matter? Well, I'm more familiar with the engineers case, and that's pretty close. That's the Supreme Court case, and it was a trade association that said that engineers cannot competitively bid on architectural projects, and the Supreme Court said that's an antitrust violation, and we're getting something very similar here. These are like trade associations, these board of dependents, and they're saying physicians cannot speak out about something. They're going to get kicked out of the group, and that's what the engineers did. They kicked them out. They competitively bid. Let me give you a couple extra minutes, and I'm going to give the other side a couple of extra minutes. Can you address the defamation claim? I can. So, this revoking of certification is devastating to a physician. I mean, people see that someone's physician's board certification was revoked, and ABIM, when they do this, they publicize it, which is another reason this is state action. I mean, generally, when you get disciplined by a university, which happens all the time, it's a private matter. It's between you and the university. It's handled privately and appropriately. But ABIM, it's good, and it's not, so they revoked merit to be important, and they just put it out. Where is it that, how would the objective reader put disinformation, doctor, associate that with your clients? Well, an objective reader, and ABIM, we've gotten a complaint that they put this census to the Washington Post and so on, that the average reader is going to conclude these are bad doctors. But no, conclude that when they say disinformation doctors are friends of the virus, that they're talking about your clients. How would one discern that from the record, or from your allegations? Because ABIM said that, Chief Judge, and then they went after these doctors, so. Wasn't it the reporters who actually used the term disinformation doctors, as opposed to the board? That may be, Judge Ramirez, what ABIM's president said that these physicians are friends of, not referring to them specifically, but said, we're going to take care of physicians who are friends of the virus, friends of COVID, and then they took action against these specific physicians. Did the ABIM president actually say they are disinformation doctors? I'm not positive about that, Chief Judge. That's a good question. I'd have to recheck here. So let me follow up, because I'll admit, I get your points on the Constitution, and I trust I'm a little uncertain, less certain on the definition. So just to give you a sort of out of case hypothetical, if a law professor describes a judge as, or a fellow, a legal intellectual, whatever, as a hack, or as a judicial activist, is that defamation? Or is that just an opinion? You sure I'm going? Well, that is actually. It's a nice thing to say, but is it really defamation? That's, it comes close, because if you impugn the professional integrity of someone, if you, that's considered defamatory per se. If you impugn- Happens every day. Academics and legal commentators do it all the time. I wasn't aware that these are all defamation claims. I think it's close to the line, but I will say that that's actually one of the exceptions to strict scrutiny, or where they have found the strict scrutiny of If somebody starts to really impugn the integrity of the judiciary, and a particular judge, and really go after the judge, that person, that goes beyond First Amendment protection. I guess I'm wondering if there's a little goose gander problem for you. I take your First Amendment objection that they're infringing on your First Amendment rights. I wonder if your defamation claim is, it's not doctrinally formally intentioned, but it's a bit conceptually intentioned, isn't it? That they're not But you're also suggesting that maybe they can't talk. Maybe the right answer is both of you guys can talk. You went on one claim, or at least you've got a trial on one claim, and you don't get to on the other. I'm not ruling. I'm just trying to figure this out. Your point's well taken, Judge Howell. Your point's well taken. I'm very supportive of the First Amendment rights in this case. That's the case of actual First Amendment rights, and they can say they have First Amendment rights, too. I understand that. But the way they present it on their website to this day, where they say, certification revoked. And the context of that is a certification That's actually true. Well, it's, but the context That may or may not be an antitrust violation. It may be a lot of things, but that's not defamation, is it? That's what they'll say, Judge Howell. But the certification, what it's been about for a hundred years, is knowledge and confidence. That's what it's been about. I accept your constitutional theory, your antitrust. It's just the defamation On the government, claim against the government, other than discovery, what is it that you wish from the government at this point? Chief Judge, now that we've had a change in administrations, and President Trump redid that board that I was suing, saying there was not balance on the board. So he's redone it. He's put Rudy Giuliani on there. So all that goes away. And you're exactly right, Chief Judge. But you don't get to claim against somebody just to get discovery against them. Can't you just file third-party discovery against them if that's where we are? You're right, Chief Judge. The trial judge denied my discovery against them. But, I mean, assuming you want discovery against them, if they're not in the lawsuit anymore, and they don't want to give you the discovery, even if it's public information, could be public information, and I think somebody else was putting it out on the internet recently, you could still get that through normal process where you subpoena from third parties if they're not, you don't have a standing claim against them at this point. At first, I thought from the previous argument that there was the possibility that it might, they might resume, you know, if there's another administration and you were seeking claims against them. But I'm not clear that you were seeking that anymore from your brief. I'm not here on it. So, Chief Judge, you're right. Did the district court deny your discovery or merely stay discovery while it was able to resolve the motions to dismiss? That's correct, Judge Ramirez. The trial judge stayed discovery if the plaintiff was in the case. So, I've never had discovery in this case from any party, and I just want to, the other side will come up, and as they did in their brief, they start making all these factual arguments. They say, well, the doctor can still practice medicine and this and that. I've never had discovery. The only facts in the case are what's in the complaint. Isn't a motion to dismiss based solely on the complaint rather than any facts outside the complaint? It should be, Judge Ramirez. You're right. It should be. And on the complaint, I clearly state multiple times that these physicians need this board certification to practice medicine in their hospital. So, the first argument of the case, the other side will be, well, no, they don't need it. They still have the medical license. They have the medical license, but they can't practice medicine as they were trained to do. They can't deliver babies in hospital. The attorneys can't go and see their elderly patients in the hospital because their board certification has been taken away from them. And that's all in the complaint. So, I don't think the other side should be able to go outside the complaint and make these arguments. If you don't have discovery, you have to stay within the complaint. If we're at 12B6, then we're at 12B6. If it's been converted to summary judgment, we can do something else, but it certainly hasn't been converted to summary judgment. I don't think the opposing side is arguing that it has. So, thank you. We heard your argument, and you still have time for rebuttal, sir. And you should have two extra minutes, but probably four extra minutes, but y'all may want to divide that some other way. Thank you, Your Honor. Good morning. My name is Jason Leckerman. I represent the American Board of Internal Medicine, otherwise known as ABIM. Because I have a limited period of time, I'm going to focus on the First Amendment. Did the ABIM president say they were disinformation doctors? About the plaintiffs in particular? No, not at all. Did he use the term, or she use the term, disinformation doctor? He did not, and there's no allegation. Ever, about anyone? Well, it's not in the complaint. I can't tell you ever anyone ever did it. I can tell you there are no allegations about it. And it's not attached to the complaint or any document? It's not attached to the complaint at all, Your Honor. So, what counsel said regarding the defamation case is the only specific statement, or defamation claims, that the only specific statement was that the plaintiff doctors, right, were decertified. That was true. That is accurate. There's no defamation claim. Why were they decertified? They were decertified because they did not meet the professionalism standard. Why didn't they meet the professionalism standard? Well, it was determined by ABIM that the statement that they had made was alleged. So, it's alleged by the plaintiffs that the statements were related to the treatment of COVID-19. And that's the allegation. There aren't additional specific allegations as to the decision made by ABIM in the complaint. But we know that's the gist of what the plaintiffs are talking about. Now, whether that's a violation of the constitution or the antitrust law is the real question here. And regarding... Well, you know, we've learned a lot about COVID and the treatment and who might have been spreading disinformation about COVID. That's changed a lot over the past couple years, hasn't it? It has, Your Honor. And is the organization relooking at this? Or is there a method to become recertified through them if they've made a mistake or something? Well, it's my understanding that the organization's always considering the state of science. Right. But what about as to these particular people and the statements they made vis-a-vis now what we know that we didn't know in 2022? At this stage, Your Honor, I haven't looked into that. I've relied on the allegations of the plaintiffs here. Okay. Can you tell us what would be unethical to say in the context of abortion? Your Honor... So, I mean, the reasonable board-certified professional needs to know this so that they don't misstep and get decertified. Your Honor, those allegations are directed towards... The other part. Okay. Well, let's talk about COVID. Can you say that masks don't work? Can you say that the vaccine doesn't actually prevent the COVID? COVID, it just makes it lesser. Can you say things like that or not? Well, doctors are free to say that, right? Would that affect their board certification? Well, if it doesn't meet the professionalism standards as determined by... What are the professionalism standards? We need to know what they are so we can determine if that's fair or not. Well, Your Honor, the first question is whether this is a... If we're focused on the First Amendment claim, whether they are state actors, right? You can talk about that, too. Well, the claim is that they are... That the First Amendment rights are being somehow violated here, but there are no First Amendment rights here. You don't have any First Amendment rights? Well, the ABIM is a private organization. By the way, it is not a trade association. It is not a member association. It is a non-profit entity, a single entity. There are no First Amendment rights that the plaintiff can assert against ABIM. Certification is not a traditionally exclusively performed function by the state, and that is the law in the Manhattan Community Access Corporation case by the Supreme Court. Justice Kavanaugh issued that opinion, 2019. It was very clear. So it depends on context, though, wouldn't you agree? Let me give you an example. In Texas, I used to be an appellate litigator, and there's this board certification that's out there for appellate lawyers in Texas. I never took it, never wanted to, and it didn't affect my practice at all. I take it this is very different. In fact, our court has already said that this is very different, isn't it? Well, I think the court here has said it's not different. Bailey v. McCain... So what I'm reading is, in this very case, in the previous appeal, from the unanimous opinion, board certifications in this context constitute de facto essential credential for physicians to practice and participate in most hospitals and insurance networks. Your Honor, I read that part of the opinion as accepting as true what plaintiffs had alleged. Fair enough, and we're still at the pleading stage here. You are absolutely entitled to prove that wrong and therefore to win that trial. The question here is, why not go to trial? But if you look at plaintiffs' complaint, they actually don't say these things, right? What they say is the majority of hospitals or networks required, not all of them, they also say... Is it 80%? Is that the number that I'm referencing? No, 80% was the alleged market share of ABIM in whatever its market is.  And by the way, 80% means there's 20%, right? It doesn't have that 20%. So if the defendant, if the plaintiffs want to go and get certified, there's 20% of the market that concerns... And that goes to Judge Alrod's market definition questions. Yeah. Well, that also goes to whether they're de facto excluded. If there is a way to get certifications otherwise, that other 20%, then there is no exclusion here. But even if you look at that exclusion, that exclusion is not done by ABIM or any of the boards. That exclusion is the insurance companies and the hospitals. They make those decisions. That's not a decision made by ABIM at all. And there's no allegation in the complaint that the ABIM had anything to do with those decisions. And so when you say it deals with context here, I mean, at the end of the day, the question that the plaintiffs have raised is whether ABIM is performing a public function. And that test is the one outlined by Justice Kavanaugh. And they have nowhere alleged any facts that satisfy the test. And in particular, this is getting to something Judge Ramirez was talking about, the decertification. Decertification is not a function that was traditionally exclusively reserved for the state. That has never been the case. And then if you look at this court's decision in the Bailey case that we cite, it's very clear that even if you need certification, and this is a case where you needed certification, even if you need certification to get your state license, which there it was for horse racing, that is still not a public function. Well, they didn't refer to public function. That is still not state action in that case. And I think Bailey ends it here. But if that's not enough, then you can look at the Tarkanian case that we cite by the Supreme Court that also is consistent with that decision. And then regarding the questions related to antitrust. Now, the first question on that is the antitrust injury question. Now, because it's 12B6, the court can decide any way it wants. You can choose to decide on the 12B6 related to whether they have stated claims under Section 1 and Section 2 of the Sherman Act, or whether they have stated antitrust injury, because antitrust injury is a part of those claims. Here, I think we need to deal with the defendants in two different groups. First, AAPS. AAPS is not an organization that participates in the alleged markets of the board defendants here. AAPS puts on conferences. What we know, even though there hasn't been a sufficient allegation to define a market, we think at best it's this market in which they may have 80% share. We don't have to actually parse it like that. We just have to find one. Well, for antitrust injury, it's different from Article 3 injury, Your Honor. Right, but I mean, I don't think that we have to. The doctors have antitrust injury, and it affects the consumers. They have alleged it, at least. Well, I will address the second point. But the first point, I don't think that's correct, Your Honor. To state a claim, every plaintiff needs to state a claim. Antitrust injury is a part of the substantive claim. It is not a standing question like Article 3. So, I agree with you. They're along for the ride that people don't want to come to their organization. It's a group boycott against this other organization, basically, by saying, oh, you go there, we're going to really scrutinize what you say there. That's what the claim really is against the other organization. But they haven't alleged a group boycott. You asked that question. I know, but that's what it's really about vis-a-vis them. And you're right, it might not be that they have a viable antitrust claim. But there's enough other antitrust people, and can you talk about them? And we still need to get back to what are the ethics rules that apply vis-a-vis your client in the COVID context. We still haven't talked about that. Okay, got it. Can I deal with the antitrust claims, and then you can bring me back, and I will do my best to deal with that? Yeah, because we can skip over that. So, Your Honor, on the antitrust claims themselves, right? So, first you raised that isn't it really a group boycott? Well, a group boycott would require that you have the defendants acting in the same market. But as Judge Ho noted already, the plaintiffs have alleged that each of the defendants have 80% market share, right? Well, you can't have 80% market share. Everybody can't have 80% market share in the same market, right? So, plaintiff's allegation is that they're acting in different markets, right? So, you don't have a group boycott across markets. That doesn't make any sense. Plus, they admit that 20% of each of those markets is not occupied by the defendants. I'm not sure that he said it, but theoretically the market could be the market for board certification, and that all of these groups work in concert to make sure that only certain doctors with certain beliefs can be board certified across a variety of specialties, and they act in parallel concert activity. I've got my Aretha Hoban camp here, but he may not have alleged that. So, if you want to deal only with what you think he has alleged, that would be helpful. Okay. Well, he has not alleged the group boycott. Instead, he has alleged that there is a conspiracy, right, by the boards here. But there are actually no allegations supporting a conspiracy of any sort here, Your Honor. There is maybe one statement, one allegation of potentially parallel conduct. In this case, I think it's in 2022, where the defendant ABIM and the defendant ABOG, not the other defendant in this case, ABFM, issued a statement of support, right? A joint statement. That's the only allegation of any parallel conduct, but there's nothing in the complaint to say that they will move to decertify doctors who don't meet their professionalism standards. There's nothing in the complaint that says anything beyond that statement regarding their conduct. Can't you put together the statement that they made, then what actually happened to the plaintiff doctors, and then say, this too could be you, and also the idea that they are discouraging people from speaking at this conference? And also put together the, when the congressperson said, don't you have some rules against people speaking out on kind of ways that are not orthodox? And the person jumped in and said, yes, of course we do. Well, I think that congressperson was referring to abortion, and that's not, there are no allegations regarding ABIM. Not here, but across the board with all of these. I think what we have to, I think we're putting together disparate events, and they are trying to create a conspiracy out of that. That's what you do. No, you have to put events that look like there's a common, right, scheme in place to obtain an unlawful end. That's what the law is, your honor. And if you look at the Twombly case, I mean, this case fails significantly under Twombly. They haven't alleged that parallel conduct that you need to begin with, but beyond that, for section one, you need a plus factor. They don't allege parallel conduct? No, you need parallel conduct for an unlawful end here. The only parallel conduct they allege is that one statement I referred to. Well, the unlawful end is the anti-competitive effect of having doctors who are only of, to exclude political doctors, doctors whose politics don't agree with the prevailing elite conventional opinion. But there's no allegation or well-pled allegation that they ever agreed to that. Well, but they can do the dance, the brown ligget and all of that from 20 years ago, 30 years ago. In order to state their claim, there could be the parallel conduct, but then there needs to be a plus factor as well. And the plus factor is the anti-competitiveness that consumers can't get doctors who they're comfortable with, and so it limits options for consumers. Your Honor, that might be the hypothetical unlawful restraint right here, but that is not a plus factor showing a conspiracy. That is a different question, and there are none of them well... There's not an economic motive to do this. So that's what you look for to see is the idea that you limit the number of doctors who can be... I mean, there's an economic motive in general to limit the number of board certified for greater compensation, etc. But there's not an economic motive to eliminate political doctors because it's actually to the contrary, because then the consumers can't get the doctors. And so if there's not an economic motive for it, then it's not pro-competitive conduct otherwise, and so that's a problem. No, the question for the plus factors is whether it's against the economic motive. And it is, because then they can't have as many people servicing people. There's a need in the don't have the progressive views that the other people have because it makes patients comfortable and it encourages them to go get medical treatment, etc. You need all the doctors. You need diversity of doctors so that the whole consumer populace are served. Well, so that diversity is served by having board certifying organizations. Patients, insurance companies, hospitals could decide a board certification from ABIM. That is worthwhile to them. Some can say ABIM has these viewpoints that it doesn't agree with. So it doesn't matter to me. Oh, I'm going to go with the other 20% in the market that want to deal with it. But they might not be high end. They might not be high end in major cities or something like that. You might not be able to practice at the Texas Medical Center in Houston. None of that's alleged here, Your Honor. I mean, plaintiff's allegations say none of what you're talking about. That's a problem. I'm not, I have to really parse with this complaint. But assuming that we're alleged enough that you couldn't, you couldn't get, you couldn't get elite practice. So can I ask a question just to try to establish a baseline, because we've got pleading issues, but we also have just sort of fundamental bedrock antitrust principles. I want to focus on the fundamentals. I get that you have a lot of arguments. I acknowledge all of them. We'll get to that. We'll certainly get to that after the argument. But just to lay the groundwork, if, putting aside completely this case, a certifying entity controls entry into the market, and the certifying entity uses that control in order to exclude people for reasons, exclude businesses from entering without basis in industry standards. And it does so as a result, restricting output. I assume that's a classic antitrust injury case. Again, this is not this case. I'm just trying to establish what the actual flaw is. Or are you saying, is your argument certifying entities can do whatever they want? They can block entry. It doesn't matter. No, we don't care about that from an antitrust standpoint. Your Honor, I'm not foolish enough to say that under any hypothetical. Exactly. That's what antitrust is for. I would not. Would you agree that antitrust is to prevent certifying entities from excluding entry, from raising barriers, creating barriers to entry, excluding businesses from entering, thereby restricting output and increasing prices? That's classic antitrust. Would you agree? Well, if you have a monopoly, right? You have to prove that it's a monopoly. And with that monopoly, of course, it's more... If you're certifying... Yeah, if your certification doesn't matter, if there are lots of other ways to certify, if you're excluded from nothing... Yeah. My hypothetical was you are... So let me polish my hypothetical for you. The certifying entity, it does in fact have the ability to exclude entry into certain markets. Let's just stipulate that. So no pleading issues, it's not this case. Would you agree that's an antitrust violation? Or at least it could go to trial? Not necessarily, Your Honor, because if... So not necessarily not, not necessarily yes. Well, because I think we need more facts. Exactly. Thank you. So depending on the facts... That's all I'm actually asking. If there was 100% market share, if plaintiffs could allege or prove that there was not easy market entry... Is that your argument though, that short of 100% there's no monopoly? No, I'm doing my hypothetical, Your Honor. I'm going with your hypothetical. Okay, fair enough. But you would agree 100%... I see your point that you're giving me if it's 100% fact, fine. I have to give all these things... But just to be clear, you're not saying 100% is the legal requirement. That would not work. I've done a little antitrust in my life, yeah. But Your Honor, there's also the question of who's excluding them from the market, right? Is it the board certifier or is it the insurers, the hospitals, the providers, anything along those lines? That's the question. You could have 100% share or something, but the... But the market reality, but I assume antitrust liability does... Take into account the realities of the market. That's the whole point of antitrust analysis, I understand. It's all very contextual. It's all about storytelling and what facts you can prove up to establish your story. So in other words, you can have one market where the entries are low and nobody cares about the certifying entity. That's basically, this is my understanding of the Texas bar, right? I mean, at least in my world, nobody cares about these certifications. The state bar is going to be angry with me for saying that, but it's absolutely true. Nobody cares if you're certified for a ballot. That's not true, at least in other situations. I'm not talking about this case. There are other contexts. We can have the debate about the Texas bar. You can tell this is a side debate that we've not had. But my point is, actually, let me use that. That very debate is what we do at trial. So my theory couldn't be dismissed. Elrod's theory would get to go to trial. Well, it depends if you would... If it's possible. If you plan it. Yeah, I mean... Because keep in mind, we're not just dealing with this case. We also have to establish the law for future cases, and that could be part of our concern as well. I understand, Your Honor. But this particular case, they haven't pledged the fact to support... But you'd agree if it was pledged sufficiently. If it were pledged sufficiently, in a hypothetical future case, a certifying entity cannot use its power, if it has this power, to block entry in order to exclude people and thereby restrict output. Well, in this case, it's decertification. And so there has been no allegation regarding the certifying, right? It's the decertifying. Sure. Replace everything I said with decertifying. That's fine. Well, I mean, decertifying, the question is whether decertification is a separate product market from certification. Imagine a market where everybody gets to come in, and the only purpose of the entity is to say, is to be told, you're out, you're out, and you're out. And it uses that to restrict output. If here, for instance, the state medical board, right, makes the certifying decision, and takes the state medical board, says, you know what? I'm going to give this to a private entity, right? Private state medical board entity. That private state medical board entity who makes the decision regarding, sorry, regarding license to practice medicine. I could see that, right? That would be a problem, something along those lines. That seems consistent with your hypothetical. Can we, we still have to talk about COVID, but before we do, can we, you know, are you familiar with this global alliance for responsible media hypothetical that may not be a hypothetical that I was posing earlier? I heard your honor refer to it. It sounds like the case went away, so that's probably why it's not on my radar. Yeah, that's okay. So I'm, so assuming that a coalition of advertisers refuse to place ads on platforms, because they don't like the politics, not because they don't like the price, and they did so allegedly because of brand safety. Is that analogous to this, the idea that you can go speak over at that organization because, you know, you're going to get into trouble talking about COVID in ways that might not be appropriate and we're going to come after you? I don't think so, your honor, because a group boycott of an advertiser is a well-recognized antitrust violation. I think people just didn't conceptualize that people would decertify doctors based upon views about political issues, and that's why it's somewhat new. Nowadays, though, we've gotten into that, you know, in corporate law now, as part of this, you know, at the Harvard Business School, we study the benefits to the community instead of just to the shareholders, not just profit-based. And as part of that, politics and public policy have become part of the analysis in ways that people, when Professor Arita was alive, people didn't think about doing business that way. Your honor, the antitrust laws are not the place to decide public policy, right? That's why there are no cases involving something that's at all similar to what's being alleged here. If Congress wants the antitrust laws to cover public policy, then it can amend the antitrust laws. So is the solution that the FTC could bring, well, I guess this would be a Section 5 claim and say this is unfair, or that the states could say, you're no longer going to be our board certifier because we, just like we decoupled from the ABA, we're going to decouple from you because we are concerned that you've allowed politics to trickle in and preclude people. Is that the answer to this societal problem, if there is one? That's not a negative question for you. No, I understand, your honor. The FTC, I would say, still doesn't have it. You don't think there's a Section 5? Section 5's pretty broad. Section, yeah, but it's unfair methods of competition, right, under Section 5. They're going to have to show more than impact on the two plaintiffs here to do something. Well, it chills a lot of other points. They're also going to have to identify, but there are no allegations that anybody else was decertified. But no, but chilling, you know, if you're vague on what can decertify you, if you're intentionally vague, and we're going to talk about what is the bad thing you can't say about COVID. If you're vague about that, but you say it's out there, and then you decertify just a few people, you don't have to decertify a lot of people to get a lot of conformity. Your honor, but there are only two here, right, and there's no, now if we're focused on the antitrust claim, right, two doctors in the entire country, in fact, one of whom doesn't even practice anymore, gave up. So we only have one doctor, one practicing doctor alleged here at all in the entire country. We don't even know what the relevant product market here is. We don't know what the relevant geographic market here is. I don't think the FTC would take this sort of claim. Did your organization take a position on the Mithapristone distribution through allegedly illegal channels? Your honor, did your organization, I know the other, we're going to talk about that, but did you- I don't know the answer to that, your honor. It wasn't led and- It's not alleged that your organization, do you know what your organization's views are about COVID that could get you decertified? I don't know. All I know is in this circumstance, the views that were alleged by, that the plaintiffs articulated- So you don't even know what the permissible views are on COVID and the impermissible views on COVID are? No, I don't, your honor. Okay. No, it's just they have professionalism standards. That's what I understand, and they were enforcing them, and they're entitled to do this. But you don't know if they actually were or not professionalism standards? Well, that's what they referred to them, right? And that's a requirement for keeping their certification. Well, if you don't know, I mean, was it because they were prescribing ivermectin for off-label uses, or was it because they believed it was a lab leak, or was it because they believed that you didn't need the vaccine, or it didn't help or immunize you, or- They don't allege any of that, so, your honor, I can't- Okay, okay. I know I've gone well beyond that, your honor, so thank you. Thank you. Well, we ask that you affirm this to the court in all respect. Thank you. We appreciate your help to the court. Good morning, your honor. May it please the court, I'm Daniel Hatchett. I'm counsel for the American Board of Obstetrics and Gynecology. And we have a lively bench this morning, so I'm excited to answer as many of your questions as I can. But I'm going to focus on issues that are particularly salient as to ABOG, the American Board of Obstetrics and Gynecology. And I'm going to do my best to keep it structured, starting with the First Amendment claim, and then I'm going to the antitrust claim, but I understand you may have questions that will take me in different directions. So, starting with the First Amendment claim, the point that I wanted to make first that I find particularly striking, actually, is against Judge Ramirez with the point that you made, which is that the plaintiffs in this case repeatedly, consistently, and very clearly concede that the board defendants are not state actors when they engage in the act of certifying positions, and particularly as it relates to ABOG. And the one place that I would point the court to, if you're looking where this is in the briefs, in the reply brief, I think you referred to a place on page 14, I think even more clear on page 5 and 6 on the line to carry over. So, I just want to read it. It says, plaintiffs do not seek an expansive ruling declaring the board defendants to be state actors for their traditional work of objectively grading multiple choice exams to grant initial board certification, but seek a narrow ruling that when a board defendants abuse their monopoly power to revoke board certification based on viewpoint discrimination, then that is state action subject to First Amendment. So, I want to make two points as it relates to ABOG. First, this test, even as it's written, would not apply to ABOG based on the pleadings, because there's not a single allegation that ABOG has ever revoked any position certification ever for any reason, let alone based on their viewpoint or an expression of viewpoint. None of the plaintiffs are OBGYNs. None of them has had their board certification revoked or they've been decertified, and the plaintiffs have not identified any positions in America who has ever had their board certification revoked. Do they allege that physicians are chilled from speaking out about Mr. Prestone because they might face a decertification? No, I do not think that they've alleged that. I believe that that's some of the rhetoric that is in the complaint. Obviously, the physicians are concerned. What's the difference between rhetoric and an allegation at the 12B stage on this type of issue? I do want to talk specifically about the statements that ABOG put out that they suggest are creating the threat. The statements, there's two that they refer to in the complaint. It's a statement that was put out in 2021 and another one in 2022. What those statements say is that intentionally providing misinformation that can harm patient safety or health could result in adverse action. One, I want to be very clear for the clarity of the record. ABOG is not a pro-choice organization. It's not a pro-life organization. It's a politically neutral organization and it has certified physicians at every conceivable point on the continuum of beliefs about abortion, including hundreds or thousands of physicians that are stridently pro-life in their thinking. The organization makes very clear that physicians are free to practice according to their moral, religious, and ethical beliefs and that they have a First Amendment right to communicate their beliefs about abortion. What is it in particular that is the misinformation? Because if it's vague, then it chills, it over chills, just like in any normal First Amendment context. The idea when you're vague about what you can't do, then people reserve more speech than they need to. And so one, the two statements are even issued in the context of abortion. I mean, there's a reference in... What is it that you can't say about abortion that would get you decertified? I mean, candidly, I don't know because no physician has ever been decertified. Well, what is this information of which you thought was so important to put a memo about? What was being said that supported that memo, those two memos? Yes, I actually don't know the context. Well, don't we need to know that? I mean, I would say that it has to be alleged. So let me give you an example of what might fall within the category of the statement. Thank you. So let's say you have a physician that goes on BNN and says, notwithstanding what you've heard for the last 50 years, pregnant mothers should smoke cigarettes because that would be healthy for their babies and the development of their babies. Now, we all know that that's not true. And if that physician is an ABOG certified diplomat and ABOG is concerned that they're out there encouraging pregnant women to smoke cigarettes because it will help their babies, they may want to take action because that is bad for public health and the safety of... What about if the physician goes out and says, if you've taken one of the abortion pill protocol, but you haven't taken the second one yet, you can reverse the process midway through and that there is some success. There are some risks, but in a number of cases, it has proven effective to reverse the abortion process. I thought your organization had taken a position that you can't advocate for the interruption of the two pill process. Yes, that's certainly not true. That's certainly not in the complaint and I'm not aware of that. I actually thought it was in the briefing as well. Your organization hasn't taken a position about whether you can interrupt the two pill process and that it's saying to the contrary, it's bad medicine? There's, to my knowledge, not a single physician in America that has ever been censured over the fact pattern or been threatened to be. And that's not part of this lawsuit? Not. I mean, if we're doing as we must and take the complaint on a base, which my understanding is that, you know, the court accepts that premise that the complaint is what controls. Right. You chose to move to dismiss rather than for summary judgment. Right. That you take that. And so I would say unequivocally, no, that that is not part of this complaint. It's not part of this case. Okay. I don't even think that that's in doubt. I think if you ask him if that's in the complaint. Did you take, I think Judge Ramirez has a question. Do you have a question? Briefly, were either of the two individual doctors who are plaintiffs here certified by ABOG? No, they're not OBGYN. I mean, they've never held a BOG certification. They've never sought it. They've never had it rescinded. There's not a single doctor that has ever been identified in America that's had their license revoked for any reason, let alone views about abortion or their expression of views about abortion. It is just not in the complaint. And to my knowledge, it's not a factual reality. The plaintiff has no qualms with introducing in their briefing things that are outside the confines of the complaint. Here we are five years past these statements and they've not identified a single physician that has ever had issues. Again, there are hundreds, thousands of physicians in America. I have four children of my own delivered by three different doctors, and I know that two of them are pro-life. They're ABOG certified. And I knew that because we communicated with them about their pro-life views. There's just not an allegation that ABOG has censured speech based on physician's viewpoint on abortion. Is there an allegation that ABOG put out something that says that we're going to stand with you if you are illegally dispensing methopristone across state lines against state standards, state law? No. There's no... ABOG has never said that. No, you asked me if there was an allegation. I don't know what has been... I have focused on... You know that. You don't know what ABOG has said about that, that they would help judge doctors who are dispensing methopristone allegedly illegally. We're not prejudging all of that. Yeah, I mean, so... And that they would not decertify them for that reason? 100%, I'm not seeing any statement that suggests that a doctor, what you're saying is they said that they wouldn't decertify the doctors who allegedly... And maybe it's not your group. So there is, in the complaint, there's a reference to another organization called the American College of Gynecologists. American College of Gynecologists, and they're not... That's not ABOG. They're not here. They are not... That's the one who said that. I don't know, to be honest. I mean, I focused on the complaint. If you read the complaint, you're going to find very few references to ABOG actually in the complaint. And I have read the complaint. I have it here. The other thing I want to say, just coming back before I turn to you... So there's nothing about your... Let's just button this up. Your client has said nothing whatsoever about statements on abortion or abortion medication or the FDA and it's laxening of the rules or any of that that would cause the person to believe that they could be decertified if they spoke to the contractor. So, again, focus... I can't speak for... In the petition. In the record, no. It's not in the complaint. And I am personally not aware of that. Okay. Then we're good. Okay. Yeah. But I would say, I mean, again, going back to the statement that I looked at on page five and six of the reply brief, and so it makes a statement that it's not... They're not state actors when they certify doctors, but they are if they revoke that certification. And, again, just on a safe bet, it does not apply to ABOG, as pled, because there is not an allegation that ABOG has ever revoked any of this certification. But I would also just say intuitively, and I'm going to talk legally as well, but intuitively, this makes no sense, that an organization would be a private organization when they hand out a certification, but would become the state when they take back that thing that they handed out as a private organization. So what if he made a mistake? What if your friend on the other side made a mistake and should not have conceded that? Is that proof fatal for decertification claim? So... Because it's logically inconsistent? Or can he say, actually, I was just making a factual distinction that I didn't think they discriminated in that area, but they discriminated in this other area? Yeah. So, one, I don't think it's a redeemable mistake, and so I'll talk about that. If he made a mistake, that's definitely on the plaintiff, not on the defendant. But what results? Can we construe it that he just doesn't have the facts for that side of the house, but he does for your side, or he alleges them? I mean, the reason that... I would say it's not a mistake, and the reason it's not a mistake is because the law is uniformly one-sided, that the process of issuing certifications is not state action. Regardless of whether other hospitals or downstream players put significance on it, it's not state action because it's not an exclusively state function. And so, there is a reason why the plaintiff... I mean, it's probably a half dozen or more times across the briefing makes this concession that they're not state actors. So, it was not a mistake. It was a very deliberate... Well, was he saying they're not state actors because they... Was he saying... Was he saying they weren't state actors? He wasn't saying that they didn't discriminate? Yeah. So, he says they're not state actors when they do an objective... Yeah, because they're objective in it. I thought that's what he was saying. They're objective. So, if it's a state test, they're state actors? I mean, that makes no sense. It just doesn't. I don't think there's any... Whether you're a state actor or not doesn't vary by whether you discriminate or not. Yeah, and I think that's the other problem, is he's conflating the question of viewpoint discrimination with whether or not you're a state actor. Basically, the plaintiff's position is, if it's viewpoint discrimination, then you're the state. And if it's not viewpoint discrimination, if it's objective, then you're not the state. That's not the way the test works. Your points are well taken, honestly, on all this. My question is, is it his fault or is it the court's fault? Both sides, you take the law as it is, and if there are problems in our law, the Supreme Court just reversed us in Olivier, and essentially it's a case I'm not holding you accountable for, but it's a perfect example of how the case law made no sense and they had to fix it. It wasn't the litigants' fault. Perhaps that's what's going on here, is it's not your fault or opposing counsel's fault, it's our fault. We're writing bad law and we need to fix the law. Well, I mean, if there's binding precedent, this panel can't fix it, but... Well, but his point is, the precedent, as I understand it, is about certification, not about decertification. So we're not required to extend bad law, we're required to follow it. I would say, I mean, there's a question of the certification question, but there's also just the basic public function test, which is very clearly laid out by the U.S. Supreme Court. So I don't think we're looking at... Yeah, I'm just dealing with your point that this is logically inconsistent. Counsel, I've been in your shoes. You have to argue sometimes logically and consistently because that's what the courts have given you. I'm just not sure I'd hold opposing counsel to that. Yeah, I mean, I think if you look at HALAC, the U.S. Supreme Court, the most recent case, on what it means to be a public function, which is, is it a traditional and exclusive function reserved for the state? So let me ask you on that point then, are you saying that categorically, the telling a business it may not engage in its business and it must shut down and may not make money, are you saying that that can never be a state function or that it depends on the case? I mean, you would look at the facts. Thank you. Yeah. So it can be a state function, it just depends on the facts. So on, it can be a state function. I think I want to make sure this is an important point. It can be a state function. Well, if a private organization is telling another private organization that it cannot operate its business for some reason, I mean, I have a hard time figuring out what set of facts that would become the state. And the question is, is this private organization somehow, are they issuing a decree that has been exclusively reserved to the state traditionally? It's been a traditional state function. And if that's the case... Well, would you agree that the state, traditionally state medical boards have told doctors, you're done. You're not practicing anymore. State medical boards have told doctors that they cannot practice medicine in the state. APOC has never done it. Right. And so hypothetically, I get your comment. Again, we're here to try to answer all cases, not just your case, right? Hypothetically, then a private entity that has that effective power given to it by custom, by explicit decree of the state board, or just simply by the norms of the industry. Yeah. And I think if you look at this court, I know the plaintiff refers to it as from 1977. It's a really old case. And so he critiques it. I think I would say it's a well entrenched principle in this circuit. But that was a case where there was a private organization that the state, and it's weird, and it's one of these old horse racing cases. But the state chose to accept that private organization's decision to determine whether they could run their horses or whatever the fact, I don't remember the precise fact pattern. But what the court said very clearly is the state is the one who makes the choice whether or not to abide by what that private organization did. And the state could change that decision at any time. And so this court has said that that is not a public function, that they're not a state actor in that context. And I would just say for APOC specifically, although I can't really think this medicine, they're just saying you don't hold board certification. Whether a hospital later says, well, hey, I'm only going to allow admitting privileges to somebody who is certified, that has nothing to do with their medical license. They can still practice, and maybe they don't practice at a hospital. Maybe they go to a clinic or do something else. But either way, under this court's precedent, it's not a state actor. But I would also just say it's not meeting the fact pattern you're describing. Because a board certifying organization doesn't determine whether or not somebody is licensed to practice medicine in the state. The state makes that decision. And they don't even look to board certification. We're talking about some private hospitals looking at a private certification from another private organization and deciding whether or not they want their doctors to be accredited by that private organization. I mean, it's well outside the confines of state action, respectfully. Did your client, what did he say at the Congress? Nothing. It wasn't my client. It wasn't your client? So it's not his client, and it's not your client? Whose client is it? I mean, there was a Congresswoman and a witness. So earlier, we talked about trade associations. I think this is actually really critical in this case. This is not a trade association. It's a trade association. You think it doesn't act as a trade association? Because it's a non-profit with no members. Yeah. I mean, they're not represented. I mean, there's what? I don't know. Tens of thousands of OBGYNs. You're a certification organization. Yeah. So your organization, has somebody from the organization agree with the Congressperson? No. No, you didn't? No, it's just a doctor. It could be any doctor in America. It was not a doctor who was speaking on behalf of your group in any way? 100% no. Okay. And that's not in the complaint. Okay. Well, it's in the briefing. And that's confusing, Your Honor, because there's a lot of stuff that's in the briefing that's not in the complaint. I didn't make it up on the briefing. No, no, you did not. You did not. The complexity of this appeal is that there's a lot in the briefing that is not in the complaint, and that's confusing. That thing is not in the complaint. It's in the briefing. But that's just a doctor, one of many thousands of doctors in North America. Well, it sounded like the doctor was trying to chill other doctors from saying to the contrary. Then they should sue that doctor. Okay. Fair enough. That doctor probably also is not a state actor. He could not have a First Amendment violation, but it's not ABAWG. Okay. And so that's the problem. They're trying to kind of grab all these pieces and say, oh, somebody over here was scared, or somebody over here said something. When all ABAWG has said is, if you're intentionally providing disinformation that could harm a patient, we're going to take a So if you're telling women that they should smoke, look, it could be a pro-choice doctor who says, hey, there's restrictions in the state of Texas, so you can't get abortions in certain contexts, so you should go get an abortion by any means in the back alley from a dangerous doctor who's not licensed or accredited. That would be putting patients' health and safety at risk, and so that doctor also might- What if you said you should go to New Mexico and I can fix you up, and even if you're past the time that it was recommended under the original FDA regulations to get an abortion, it's still okay because you don't have to have an ultrasound anymore. I mean, so one, obviously we're getting way off track. Well, you were the one who did the hypo. The back alley is the same. But I mean, I appreciate that. I think the question is, they're a private certifying organization, and they say, do we want to certify a doctor who offering advice that is medically unsafe? Again- It's like, what is medically unsafe, and do they get to decide if they're the certifying group for everyone in America? I mean, they're a certifying group for OBGYNs, and I mean- Yes, that's the question, and whether or not it matters. And the answer is yes, but I mean, I'll just say there's no allegation that this has ever been carried out in a way that would even remotely suggest viewpoint discrimination. Thank you. We have your argument. Can I say one quick thing on the antitrust claim? Because I know one of the questions that you asked was whether or not we're at the stage where we would define the market. And I do think, I mean, the law is very clear. I think in our brief on page 47, we cite a number of cases from this circuit that talk about how defining the relevant market is a pleading issue. And so you unequivocally have to define the relevant market at the pleading stage. And all the other analyses that we engage in and we look at is it's critical to start with the market, because you can't assess whether there's an injury to competition or trade unless we know what the market is. Right. So if they wanted to make the Texas Medical Center argument, they needed to have made it already. Is that your point? Well, one of my points is that a lot of the references to the market are markets for the provision of medical care. And ABOG is an organization that certifies physicians. It doesn't operate as a market for the provision of medical care. And so this court very clearly, it's a case of, I can't say the full name because it's complicated, but it's Abraham. It's in our brief. It's 776F3-321. This is what this court said. According to plaintiffs, competition in monopolized relevant market is not a requirement for Section 2. That, this is incorrect. And what the court goes on to say is the defendant has to be operating in the relevant market. So you have to start by knowing what the market is. Okay. I think we have your argument. Thank you. Mr. Goldstein. Good morning. May I please the court? Do you have anything to add? Not really. Just to echo what you said, which is that even if this court affirms this to the Secretary, they can still seek a third-party subpoena under Rule 45. We might well oppose that from the point that they still have the procedural mechanism available to get these documents that they think are really important to them. Okay. And there's no current plan to reinstate it? Not that I'm aware of. Not that I'm aware of. Okay. Thank you. Hope you had a nice trip to New Orleans. You've saved time for rebuttal, sir. Thank you, Your Honor. There's a lot to respond to there in the article presentation by counsel for ABAG. The complaint says, and this is what we have to go by, what the complaint says, and it's true too, but you don't have to take my word for it. That's why you have discovery, which we haven't gotten to. What ABAG considers to be, quote, false and misleading, close quote, quoting from them, is almost any statement in opposition to abortion. That's the facts on appeal. So any statement in opposition... I'm sorry, what are you reading from? I'm reading from the complaint, paragraph 56, page 18. So the facts here on appeal is that ABAG considers to be false and misleading almost any statement in opposition to abortion. I mean, is it a well pleaded complaint though? What is the basis for that statement? The basis for that, two press releases that ABAG put out, and there's other things too, but primarily here in paragraph 55 and 56. In 55, paragraph 55 of the complaint, on September 27th, 2021, ABAG announced it would take action against the Physician's Certification for not, quote, behaving professionally with patients, families, and colleagues across health professions. And then in that same statement, which was while the transgender issue was very controversial, they referred to pregnant people three times and pregnant individuals once, as though professionalism requires referring to pregnant women with a gender neutral term and fully accepting transgender procedures in connection with pregnancy. And then on July 7th, 2022, and what's special about July 7th, 2022, this is in the wake of the Dobbs decision. So Dobbs came out by the Supreme Court, which one of these four defendants put out a statement and said the Supreme Court decision, our Supreme Court was, quote, egregious. Were either of your clients, individual clients certified by ABAG? Not the individual clients, no. What ABAG has done is they've put out these threatening statements, and then one of our speakers at our conferences, Ingrid Scott, was at a congressional legislative hearing, and she said that the harm from abortion is underreported, and they jumped on her. Was, is she a plaintiff? She's a speaker at one of our conferences. Is she a named plaintiff? No. Was she decertified? She was just threatened. It was a threat. All right. And where is that in your, sorry, where is that in the complaint? Because I'm looking at page, paragraph 56, which has some of what you said, but not all. The SCOP reference comes later, but if I could get to paragraph 56 here, this is in the wake of Dobbs. So this is just after the Dobbs. No, I'm just asking, you read just now in the last two minutes, you read from paragraph 56. Fair enough. You also read other things that are, I don't see in paragraph 56. I'm just asking, are they elsewhere in the complaint? The SCOP, yeah. What happened to Ingrid Scott is elsewhere in the complaint. I believe that may be towards the beginning. We'll check. I'll find it. It's in there. It's in there. What happened? It's a legislative hearing. And here in, right in the wake of Dobbs, ABAG, which it was astounding hearing the opposing counsel say it's either pro-choice or pro-life, it's 100% on the pro-choice side. And in the wake of Dobbs, they announced that it might revoke board certifications of physicians opposed to abortion if they provide false and misleading information that is, quote, used to advocate for legislation, regulations, criminal code, and health policy. They're going to revoke certification from people who testify at legislative hearings. This goes right to the heart of our democratic process. A pro-life physician cannot testify at a legislative hearing and speak candidly about harmful abortion without risking her board certification being revoked by ABAG. What's the link between the threat and ABAG? ABAG made this threat. This threat is directly from ABAG. Paragraph 56 of my complaint, page 18, I provide the URL to it. It was a press release. And they say, if you testify... You're talking about footnote 14 of your complaint? There's the URL. Yes. Right. There are a couple of URLs. You're talking about footnote 14. Yeah. The URL is footnote 14. I explained it in the text there in paragraph 56. And this is in the wake of dots. So context does matter. Any statement in opposition to abortion, ABAG would consider false or misleading. And that's your complaint. Yeah. And that's true. That's what they're doing. So our friend from ABAG said he had a pro-life physician, delivers children. That's great. Does that pro-life physician testify before legislative hearings? And all these issues, if it goes to trial, then they would be entitled to make these statements. And if we go to trial, I can prove these things in a heartbeat. I mean, poor metaphor maybe, but I can prove them very easily. Because there are no pro-life physicians to speak out anymore. Pro-life physicians don't have first amendment protections. I can't think of any... Your point is they get to be pro-life privately. They should be pro-life privately. But we need our doctors to speak out. We need them, our democratic process needs to speak out. And the Supreme Court just held, just a month ago, in that very controversial conversion therapy case. There's a sentence there in the conclusion, which I put in my 28-J letter, where the big majority of the Supreme Court says the first speech in this country. Any of you? Thank you very much. We have your argument. Thank you. Thank you. We appreciate all the arguments here in this complicated, difficult case. Thank you. The case is submitted and the court will stand in recess until 9 a.m. tomorrow.